Vester W. HOLBROOK, Appellant,

v.

Gwendolyn M. HOLBROOK
and Jeffrey L. Preston,
Appellees.

No. 2003–CA–000136–MR.

Court of Appeals of Kentucky.

March 12, 2004.

Discretionary Review Denied by
Supreme Court Jan. 12, 2005.

Patrick M. Hedrick, Ashland, KY, for appellant.

Jeffrey L. Preston, Catlettsburg, KY, for appellee.

Before COMBS, KNOPF, and McANULTY, Judges.

## OPINION

COMBS, Judge.

Vester Holbrook appeals from a judgment of the Boyd Circuit Court of November 22, 2002, which adopted the recommendation of the Domestic Relations Commission (DRC) and ordered him to pay his former wife, Gwendolyn Holbrook, the appellee, the sum of $60,659.07—plus attorney's fees. Vester argues that this money represents Gwendolyn's portion of his pension benefits. However, he contends that it was a debt that was discharged by the United States Bankruptcy Court. We are compelled to agree and thus to conclude that the trial court erred as a matter of law in failing to give due effect to Vester's discharge in bankruptcy. Therefore, we reverse and remand.

The parties' twenty-year marriage was dissolved by a decree entered in the trial court on August 8, 1991. Incorporated into the final decree was their property settlement agreement, the terms of which awarded the parties an equal interest in the marital portion of Vester's two pension funds: the Plumbers and Pipefitters National Pension Fund and the Plumbers and Pipefitters, Local # 348, Pension Fund. Because Vester had not retired at the time of the dissolution, the parties agreed to postpone undertaking the calculations required in order to determine their respective interest in the two funds. The agreement required that the parties communicate with one another to accomplish the division of the pensions as follows:

> The parties hereto agree to obtain a yearly listing of any amounts paid into [Vester's] pension plan. Upon obtaining said itemized yearly list, the parties agree that [Gwendolyn] shall be entitled to a percentage of that pension based upon the number of years married and the number of years paid into the plan. For example, if [Vester] has been employed twenty-five years and married, nine years during that period, then [Gwendolyn] shall be entitled to eighteen percent of [Vester's] pension. A Qualified Domestic Relations Order [QDRO] shall issue for the payment of same once the percentage is determined.

However, they did not communicate after the divorce. Vester retired in 1992, the year following the dissolution. He failed to notify Gwendolyn, and a QDRO was not entered. From his retirement date until some time in 1999, Vester received all of his monthly pension benefits. When Gwendolyn finally learned in 1999 that Vester had retired, she filed a motion in the Boyd Circuit Court seeking to hold him in contempt for failing to comply with their agreement. She also requested that the court order him to reimburse her for

her share of the retirement benefits that had already been disbursed to him.

Gwendolyn's share of the pensions was determined, and QDRO's were accordingly entered to enable her to receive her portion of the on-going monthly pension benefits. She has received $298.87 per month from the national pension fund since August of 1999; however, her monthly benefit of $385.80 from the local pension fund did not commence until January 2001.

Vester, by now a resident of Florida, sought protection from his creditors in bankruptcy court. His petition resulted in an automatic stay of Gwendolyn's legal efforts both to enforce the provisions of the dissolution decree and to collect the sums wrongfully withheld by him.

Gwendolyn and her attorney were named as creditors in the pending bankruptcy action and were provided notice of that proceeding. Nonetheless, they filed no claims to challenge Vester's effort to discharge his debt to Gwendolyn. Accordingly, Vester's debts, including the debt to Gwendolyn, were discharged by order of the United States Bankruptcy Court for the Southern District of Florida on September 9, 1999.

In February 2001, Gwendolyn renewed her motion for contempt and for reimbursement of her share of the pensions that had been paid to Vester between 1992 and 1999. Vester responded that Gwendolyn's loss of her share of the pension benefits was directly attributable to her own failure to have QDRO's entered at the time of the dissolution, arguing that it was not his duty to see that the QDRO's were entered. He further contended that his personal liability to Gwendolyn had been discharged in the 1999 bankruptcy proceeding. The circuit court remanded the matter to the DRC.

The DRC entered her report on February 28, 2002, recommending that Vester be ordered to pay Gwendolyn the pension arrearage of $60,659.07. The DRC concluded that because Gwendolyn had possessed a property interest in the pension plans at the time of dissolution, Vester "no longer had any interest in [Gwendolyn's] portion [of the plans]." However, the DRC did not address Vester's defense that his discharge in bankruptcy barred any further attempt to collect the arrearage.

Vester timely filed exceptions to the DRC's report, again contending that his debt to Gwendolyn had been discharged in bankruptcy. The circuit court approved the DRC's report without elaboration on November 22, 2002. Vester filed a motion to amend the judgment or to enter specific findings of fact—asking the court once again to weigh and to properly consider the effect of his discharge in bankruptcy. That motion was denied on December 19, 2002. This appeal followed.

Vester argues that the court's order violates his discharge in bankruptcy by attempting to enforce an obligation that was previously discharged. He challenges the underlying jurisdiction of the court even to entertain the issue of dischargeability in bankruptcy of his obligations to Gwendolyn arising from the decree of dissolution. He contends that Gwendolyn was required to file an objection to the discharge in the bankruptcy proceeding in order to preserve her claim against him for the pensions benefits already paid. Gwendolyn argues that the Boyd Circuit Court "saw through" Vester's attempt to defraud her of her share of the pensions, urging that he "cannot hide behind the Bankruptcy code for this type of behavior."

█ Neither the DRC nor the trial judge addressed the critical issue of the legal effect of Vester's bankruptcy. Not all marital debts are dischargeable in

bankruptcy. The Bankruptcy Code separates debts arising from a marital relationship into two classes. Some debts (such as debts for child support or spousal support or maintenance) are non-dischargeable as a matter of law. 11 U.S.C. § 523(a)(5). Gwendolyn acknowledges that the debt at issue is not in the nature of support or maintenance and that it does not fall within the protected classification. However, other obligations incurred "in the course of a divorce or separation, or in connection with a separation agreement, [or] divorce decree" are dischargeable. 11 U.S.C. § 523(a)(15). Although state courts have concurrent jurisdiction to determine whether a debt is in the nature of support or maintenance, the bankruptcy court has *exclusive jurisdiction* to determine whether a nonsupport obligation is dischargeable. 11 U.S.C. § 523(c); *In re Milburn,* 218 B.R. 862, 865 (Bankr.W.D.Ky.1998).

The Bankruptcy Code further provides that a nonsupport marital debt, like the pension arrearage at issue, shall be discharged unless the creditor files a complaint "no later than 60 days after the date set for the meeting of creditors." FRBP[1] 4007; 11 U.S.C. § 523(c)(1). As stated earlier, Gwendolyn did not file such a complaint. Thus, although she may have arguably been successful in preventing the discharge of the debt if she had responded in that forum, neither the Boyd Circuit Court nor this Court has the jurisdiction to reverse the order of the bankruptcy court discharging Vester's debt.

In the course of defrauding Gwendolyn, Vester also managed to enjoy a wrongful windfall by invoking bankruptcy. Repugnant as were both his deceptive behavior and the legal result of the bankruptcy proceeding, we believe that the trial court had no choice but to recognize and to give full faith and credit to the order of discharge of the bankruptcy court—including the Code's provision barring the commencement *or continuation* of any action to collect personal debts of the debtor predating the filing of the petition. 11 U.S.C. § 524(a). Therefore, we conclude that the court erred in failing to give effect to the discharge of the bankruptcy court.

Without citing any authority, Gwendolyn argues that the Boyd Circuit Court somehow maintained jurisdiction to order Vester to pay the arrearage because he admittedly had fraudulently received his benefits over the seven-year period. However, despite his fraudulent and unsavory conduct, the dischargeability of his debt to Gwendolyn was a matter wholly entrusted to the exclusive purview of the bankruptcy court. In addition to debts relating to nonsupport marital dissolution obligations, Congress has conferred solely upon the bankruptcy court the jurisdiction to determine the dischargeability of debts incurred by fraud (§ 523(a)(2)) and debts arising from "fiduciary misconduct, embezzlement or larceny." § 523(a)(4).

Again without citing any authority, Gwendolyn seeks to distinguish away the pre-emptive impact of federal bankruptcy law by characterizing the arrearage as a "property right" rather than as a debt susceptible of being discharged. This argument is valid only as it relates to ongoing pension benefits. That is, by filing bankruptcy, Vester cannot subject Gwendolyn's interest in the funds remaining in the pensions to the interests of his creditors; neither could he terminate her rights in his own favor.

We conclude that Gwendolyn has no claim against the pension funds for the accumulated past arrearage. Her claim for the arrearage can only be asserted

---

1. Federal Rules of Bankruptcy Procedure.

against Vester personally as his debt. 11 U.S.C. § 101(12) defines "debt" as a "liability on a claim." A "claim" is defined broadly as follows:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;

11 U.S.C. § 101(5). Notwithstanding Gwendolyn's initial interest in the pension funds, Vester's breach of the property settlement agreement constituted a claim which he was legally (although not morally or equitably) entitled to discharge upon approval by the bankruptcy court. A new debt was created each month when Vester received a pension payment which he concealed and withheld from Gwendolyn. Federal bankruptcy law and the doctrine of *res judicata* preclude further consideration by the trial court of Vester's obligation to pay that debt.

■ Finally, it appears that Vester may have received some pension benefits following the filing of his bankruptcy petition and before one or both of the pension funds accepted Gwendolyn's QDRO's. In a voluntary Chapter 7 case, only those debts arising *prior to the petition date* are eligible for discharge. 11 U.S.C. § 727(b). Therefore, we remand this matter for a determination of the amount of benefits, if any, owed to Gwendolyn resulting from the payments of pension benefits accruing be-

tween the date of filing of Vester's bankruptcy petition and the effective date of Gwendolyn's QDRO's.

The judgment of the Boyd Circuit Court is reversed, and this matter is remanded for further proceedings consistent with this Opinion.

ALL CONCUR.